NORTH CAROLINA

GUILFORD COUNTY

FILED

2021 MAY 28 P 12: 13

GUILFORD CO., C.S.C.

BY_____ mbb

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CvS 5623

WAKE BRIDGE AT WATERBURY
ASSOCIATION, INC.

          Plaintiff,

     v.

NATIONWIDE MUTUAL FIRE
INSURANCE COMPANY,

          Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

**COMPLAINT**

**JURY TRIAL REQUESTED**

Plaintiff, complaining of Defendant, alleges and says:

1.     Plaintiff Wake Bridge at Waterbury Association, Inc. is a nonprofit corporation organized under the laws of the State of North Carolina, with a principal place of operation in Guilford County, North Carolina.

2.     Defendant Nationwide Mutual Fire Insurance Company, upon information and belief, is a mutual insurance company organized and existing under the laws of the State of Ohio, and is licensed to do business and is doing business in the State of North Carolina, including Guilford County.

3.     Defendant is subject to Chapter 58 of the North Carolina General Statutes and is regulated by the North Carolina Department of Insurance.

4.     Policyholders are members of a mutual insurance company while their policy is in force pursuant to N.C. Gen. Stat. § 58-8-10.

5.     Defendant issued to Plaintiff, and at all times relevant hereto, was the insurer and obligor under a "Premier Businessowners" insurance policy, Policy No. ACP-BPHF-

2294424360 (the "Policy").

6.      The Policy's Directors and Officers Liability (Cooperatives or Condominiums) endorsement (the "Endorsement," a true and correct copy of which is attached hereto as **Exhibit A**) provides coverage for, as well as "the right and duty to defend" (Endorsement ¶ A(1)), claims made arising out of a "Wrongful Act" committed during the coverage period.

7.      Pursuant to the Endorsement:

> **"Wrongful act"** means any actual or alleged negligent:
> a.   Act;
> b.   Error;
> c.   Omission;
> d.   Mistake;
> e.   Misstatement;
> f.   Misleading statement or;
> g.   Breach of duty;
> Committed by or at the direction of a "director" or "officer" while acting within the scope or their duties, individually or collectively.

(Endorsement ¶ D(6)).

8.      The Endorsement modifies the Policy's definition of "Insured" to include, *inter alia,* board members, officers, volunteers and committee members. (Endorsement ¶ D(3)(c)).

9.      The Endorsement purports to excuse Defendant from indemnifying Plaintiff for an award of punitive damages but requires it to defend a covered claim seeking punitive damages (*id.* ¶ A(4)(i)).

10.     Plaintiff, as well as numerous of its Board members, officers, volunteers, and/or committee members, were named as defendants in an action filed by Shasta D. Staley ("Staley") in the District Court of Guilford County on or about May 19, 2018, and styled, "*Shasta D. Staley, Plaintiff, v. Waterbury Association, Inc.*, *et al.*, 18 CvD 5582 (the "Staley Action").

11.     Staley filed an Amended Complaint on or about August 16, 2018, which became effective on or about December 18, 2018 by agreement of counsel, and has been the operative

complaint in the Staley Action since that time. A true and correct copy of the Amended Complaint in the Staley Action is attached hereto as **Exhibit B**.

12.     Staley's Amended Complaint complains of various actions by Plaintiff, its Board members, officers, volunteers, and/or committee members before and during the construction of Staley's home in the Wake Bridge at Waterbury development in Guilford County, including Plaintiff's refusals to allow Staley to deviate from requirements in the community's Declaration of Covenants, Conditions and Restrictions for Wake Bridge at Waterbury (the "Declaration"). The Amended Complaint seeks actual damages, nominal damages, injunctive relief, and punitive damages.

13.     The Amended Complaint. *inter alia*, alleges numerous actions and/or omissions that if proven would constitute "wrongful acts" as defined in the Endorsement and not otherwise excluded in the Policy, including without limitation allegations that Plaintiff, its Board members, and/or its committee members:

(a)     "breached their fiduciary duty of care by making a biased decision to permanently attach the tree line to Plaintiff's house and disregarding reasonable concerns regarding safety" (Amended Complaint ¶ 83);

(b)     selectively enforced Declaration provisions against Staley but not other members of the Association (*id.* ¶¶ 84-85);

(c)     improperly cited Plaintiff for a violation of the muntin requirement and failed to follow procedures set out in the Declaration, after Plaintiff's Architectural Control Committee had waived its right to enforce the violation due to inaction for 45 days (*id.* ¶¶ 87, 88);

3

(d)     made decisions relating to Staley in bad faith and without affording her a

fair and meaningful opportunity to be heard (*id.* ¶ 93);

(e)     deceived Plaintiff by advising her she would be fined $10 per window

when the PCA allows for a fine of only $100 for a violation (¶ 98);

(f)     advised Plaintiff that she was required to comply with the 12/12 roof pitch

requirement when that requirement was void under the Fair Housing Act (*id.* ¶¶ 103-

109);

(g)     enforced the 12/12 roof pitch requirement although it is immoral,

unethical, oppressive, and unscrupulous (*id.* ¶ 114);

(h)     committed various acts of trespass on Staley's property during the

construction process by entering the property without Staley's permission (*id.* ¶¶ 126-

128); and

(i)     breached a contract between Plaintiff and Staley by inspecting Staley's

home at dates and times other than those agreed upon by Plaintiff and Staley (*id.* ¶¶ 120-

123).

14.     Plaintiff made a claim under the Policy on or about August 28, 2018, requesting

that Defendant provide defense of and, if applicable, indemnification for, the Staley Action.

Plaintiff at that time provided Defendant with materials supporting its claim under the Policy

including but not limited to the Amended Complaint in the Staley Action.

15.     Defendant, by letter dated February 12, 2019 (the "Claim Denial"), a true and

correct copy of which is attached hereto as **Exhibit C**, notified Plaintiff that it was refusing to

provide defense or indemnification under the Policy.

4

16.    Defendant's Claim Denial included the following explanation for its refusal to provide coverage under the Endorsement:

> Now, turning to the Directors and Officers Liability (Cooperatives or Condominiums) Endorsement, coverage is provided for sums an insured becomes legally obligated to pay as damages for any claims made arising out of a "wrongful act" committed during the coverage period to which this insurance applies. The Endorsement defines a "claim" as a demand for damages. However, claim does not include court costs or attorney fees when other than monetary damages are sought. "Wrongful acts" are defined in the endorsement as actual or alleged "negligent" acts. The alleged actions of Wake and/or the individuals board members described within the complaint are not negligent in nature. Therefore, we find that these do not constitute "wrongful acts" under the Directors and Officers Liability Coverage. Additionally, the individual board members may not constitute "insureds" under the Directors and-Officers coverage to the extent their alleged trespass occurred outside the scope of their duties for Wake. For these reasons, we find that the "Directors and Officers Liability form does not provide coverage for this claim.

> In conclusion, Nationwide has reviewed the suit papers provided to us in conjunction with the insurance coverage issued to Wake and declines to provide a defense or indemnity for this matter for both Wake and the individuals named in the suit.

(Claim Denial p. 7).

18.    Defendant failed to make a reasonable and good faith investigation of the Plaintiff's claim made under the Policy based upon all available information before denying Plaintiff's claim.

19.    Defendant's denial of the Plaintiff's claim under the Policy was made in bad faith.

20.    As a result of Defendant's refusal to provide defense of the Staley's claims, Plaintiff itself paid the legal costs associated with the defense of Staley's claims against Plaintiff, as well as the Staley's claims against the individual defendants in the Staley Action as a result of the Plaintiff's duty and/or authority to indemnify those persons from liability for actions taken within the scope of their duties pursuant to, *inter alia*, N.C. Gen. Stat. §§ 55A-8-51 and 55A-8-56.

5

21.     The Staley Action proceeded through discovery, motion practice, and a bench trial.

22.     After Staley rested her case at trial, the Court in the Staley Action, on or about March 12, 2021, entered an Order and Judgment, ruling in favor of Plaintiff and against Staley on Staley's claims.

23.     Staley has filed a motion for reconsideration of the Order and Judgment under Rule 59 of the North Carolina Rules of Civil Procedure, which motion is currently scheduled for hearing in September 2021. Given the history of the Staley Action, it is reasonably likely that Staley will continue to litigate the action by appeal or otherwise after the motion for reconsideration has been adjudicated.

24.     Defendant's actions described herein were undertaken willfully, wantonly, maliciously, consciously, and with reckless disregard for the Plaintiff's rights

25.     The officers, directors, or managers of Defendant, upon information and belief, participated in or condoned the unlawful conduct described herein.

<u>**COUNT I – BREACH OF CONTRACT**</u>

26.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in the preceding and subsequent paragraphs, with the same force and effect as though the same were set forth at length herein.

27.     The Policy is a fully enforceable, binding contract between Plaintiff and Defendant.

28.     Defendant breached its contract, and repudiated its obligations thereunder relating to Staley's claims, *inter alia,* by denying Plaintiff's claim for defense and indemnity of Staley's

6

claims.

29.     Defendant has unjustifiably and without reason failed and refused to provide Plaintiff, its board members, officers, volunteers and/or committee members with a defense of Staley's claims, necessitating expenditures by the Plaintiff for such defense.

30.     By reason of the foregoing, Defendant is in breach of contract with Plaintiff, and Plaintiff has been damaged thereby in a sum in excess of $25,000.00.

## COUNT II - BREACH OF DUTY OF
## GOOD FAITH AND FAIR DEALING

31.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in the preceding and subsequent paragraphs, with the same force and effect as though the same were set forth at length herein.

32.     Defendant at all times relevant hereto owed Plaintiff a duty of good faith and fair dealing, which duty encompassed, *inter alia*, an obligation to make a reasonable and good faith investigation of a claim made under the Policy based upon all available information; a duty to provide a defense and/or indemnity of a claim when facts asserted against its insured are arguably covered by the Policy; and a duty not to benefit its own interests at the expense of Plaintiff.

33.     The actions and/or omissions of Defendant, described herein, were in breach of the duty of good faith and fair dealing.

34.     In light of Defendant's breaches of duty described herein, Plaintiffs have been damaged thereby in a sum in excess of $25,000.00.

7

## COUNT III - UNFAIR AND DECEPTIVE TRADE PRACTICES

35.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in the preceding and subsequent paragraphs, with the same force and effect as though the same were set forth at length herein.

36.    Defendant's ongoing insurance and business activities including the sale of insurance to residents of North Carolina, including Plaintiff, constitutes conduct "in or affecting commerce" as that term is used in Chapter 75 of the North Carolina General Statutes.

37.    Defendant's actions and/or omissions as described herein were immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiff.

38.    Upon information and belief, Defendant has engaged in a similar pattern and practice of, unfair and deceptive trade practices in this State.

39.    Defendant's actions and/or omissions as described herein constitute unfair claim settlement practices in violation of N.C. Gen. Stat. § 58-63-15(11).

40.    Defendant's acts were immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiff.  These acts and other acts of Defendant constitute unfair and deceptive trade practices, which proximately caused injuries and losses to Plaintiff, entitling Plaintiff to recover treble damages and attorney's fees and such other relief that is authorized by applicable statutes.

## COUNT IV – DECLARATORY JUDGMENT/INJUNCTIVE RELIEF

41.    Plaintiff herein repeats, reiterates, and realleges each and every allegation contained in the preceding paragraphs, with the same force and effect as though the same were set forth at length herein.

8

42. Plaintiff is entitled to a declaration that Defendant is obligated under the Policy to provide defense of and/or indemnification for Staley's claims.

43. Plaintiff is entitled to entitled to preliminary and/or permanent injunctive relief requiring Defendant to provide defense and indemnification for Staley's claims.

**WHEREFORE**, Plaintiff, having complained of Defendant, respectfully prays of this Court as follows:

1. For judgment of compensatory damages against Defendant in an amount in excess of $25,000.00;

2. For an award of treble damages pursuant to N.C. Gen. Stat. § 75-16;

3. For the cost of this action, including a reasonable attorney's fee as permitted by N.C. Gen. Stat. § 75-16.1 and other applicable law, to be taxed to Defendant;

4. For an award of punitive damages;

5. For declaratory and injunctive relief as set forth herein;

6. For such other and further relief as the Court deems just and proper.

Jury trial is hereby requested for all triable issues in this case.

Respectfully submitted this the 28th day of May, 2021.

OF COUNSEL:

HIGGINS BENJAMIN, PLLC
301 N. Elm Street, Ste. 800
Greensboro, NC 27401
Telephone: 336-273-1600
Facsimile: 336-274-4650
jbloss@greensborolaw.com
mchase@greensborolaw.com

John Bloss (N.C. Bar No. 23947)

Margaret M. Chase (N.C. Bar No. 32620)

*Attorneys for Plaintiff*

9

**BUSINESSOWNERS**
**PB 41 00 05 15**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
## THIS ENDORSEMENT PROVIDES CLAIMS-MADE COVERAGE.

# DIRECTORS AND OFFICERS LIABILITY
# (COOPERATIVES OR CONDOMINIUMS)

This endorsement modifies insurance provided under the following:

PREMIER BUSINESSOWNERS LIABILITY COVERAGE FORM

### SCHEDULE

| | |
|---|---|
| **Limits Of Insurance:** | See the Liability Declarations |
| **Coverage Period:** | Beginning from the Retroactive Date to the end of the Policy Period stated in the Declarations for this policy. |
| **Retroactive Date:** | See the Liability Declarations |

A. The following is added to Section I. COVERAGES:

**DIRECTORS AND OFFICERS LIABILITY (COOPERATIVES OR CONDOMINIUMS)**

1. **INSURING AGREEMENT**

We will pay those sums up to the applicable Limit of Insurance that the "insured", as defined in this endorsement, becomes legally obligated to pay as damages for any "claims" made arising out of a "wrongful act" committed during the Coverage Period shown in the Schedule of this endorsement and to which this insurance applies. A "claim" seeking damages will be deemed to have been made when notice of such "claim" is received and recorded by an "insured" or by us, whichever comes first during the Coverage Period shown in the Schedule of this endorsement. Any "claims" received and recorded by the "insured" within sixty (60) days after the end of the policy period will be considered to have been received within the policy period. We will have the right and duty to defend any "insured" against a "suit" seeking those damages for a "claim" for which there is coverage under DIRECTORS AND OFFICERS LIABILITY.

HOWEVER,

a. No coverage applies for any "wrongful acts" which occur prior to the Retroactive Date shown in the Declarations, and

b. We will have no duty to defend the "insured" against any "suit" seeking damages for "wrongful acts" to which this insurance does not apply.

c. We may, at our sole discretion, investigate any "wrongful acts" and settle any "claim" or "suit" that may result. But:

(1). The amount we will pay for damages is limited as described in B. LIMITS OF INSURANCE that follows; and

(2). Our right and duty to defend will end when we have used up the applicable limit of insurance in the payment of judgments or settlements under this coverage.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

2. **SUPPLEMENTAL EXTENDED REPORTING PERIOD**

If the policy to which this DIRECTORS AND OFFICERS LIABILITY endorsement is attached is cancelled or non-renewed for any reason, you have the option to extend the reporting period of this endorsement upon payment of an additional premium.

HOWEVER, this supplemental extended reporting period applies:

a. Only to a "wrongful act" which occurred during the Coverage Period; and

**PB 41 00 05 15**


EXHIBIT
A

b. Only if this option is exercised within sixty (60) days after the expiration date of the policy or this endorsement.

3. In Section I. COVERAGES, under D. SUPPLEMENTARY PAYMENTS, the following provision is added:

Paragraph 1. of the SUPPLEMENTARY PAYMENTS – COVERAGES A AND B also applies to the coverage provided by DIRECTORS AND OFFICERS LIABILITY.

4. **EXCLUSIONS**

The following exclusions apply to DIRECTORS AND OFFICERS LIABILITY. This insurance, including any duty we have to defend "suits", does not apply to "claims":

a. For "bodily injury" or "personal and advertising injury".

b. Due to "property damage" to any owned or non-owned property, including loss of use thereof or loss of earnings therefrom, whether such loss shall be direct or indirect or of contingent nature.

c. For an accounting of profits or losses made from the purchase or sale of securities.

d. For salary, compensation or bonuses voted to "directors" or "officers" by your Board of Directors.

e. For anything other than money damages.

f. Based on or attributable to any:

(1) "Wrongful acts" in judgment or discretion in procuring and maintaining insurance or bonds;

(2) Failure or omission in effecting and maintaining insurance or bonds; or

(3) "Wrongful acts" with respect to amounts, forms, conditions or provisions of insurance or bonds.

g. For transactions of any "insured" gaining a personal profit or advantage not shared equitably by your owners.

h. For any liability or legal obligation of any "insured" arising out of any of the following:

(1) Any federal, state, county, municipal or local law, ordinance, order, directive or regulation barring discrimination, including but not limited to those based on race, color, national origin, ancestry, citizenship, gender, sexual orientation, marital status, religion or religious belief, age, economic status, income, medical condition, pregnancy, parenthood or mental or physical disability;

(2) Any state, federal or governmental antitrust statute or regulation, including but not limited to the Racketeer Influenced and Corrupt Organizations Act (RICO), the Securities Act of 1933, the Securities Exchange Act of 1934, or any state Blue Sky law;

(3) The Employees' Retirement Income Security Act (E.R.I.S.A.) of 1974; or

(4) Any other similar statutes, ordinances, orders, directives or regulations.

i. For punitive damages.

HOWEVER, if a "suit" is brought against the "insured" with respect to a "claim" for acts or alleged acts falling within the coverage of this endorsement, seeking both compensatory and punitive or exemplary damages, then we will provide a defense to such action without liability for such punitive or exemplary damages.

j. If judgments adverse to the "insured" establish that their affirmative dishonesty or actual intent to deceive or defraud was material to the cause of action so adjudicated.

k. For any injury or damage arising out of:

(1) Asbestos including but not limited to any injury or damage related to, arising or alleged to have arisen out of any use, exposure, existence, detection, removal, elimination, avoidance, act, error, omission, failure to disclose or warn of the presence of asbestos or any other duty involving asbestos;

(2) Electromagnetic emissions or radiation including but not limited to any injury or damage related to, arising or alleged to have arisen out of any use, exposure, existence, detection, removal, elimination, avoidance, act, error, omission, failure to disclose or warn of the presence of electromagnetic emissions or radiation or any other

Case 1:21-cv-00530-WO-JEP   Document 4   Filed 06/29/21   Page 11 of 41

duty involving electromagnetic emissions or radiation;

   (3) Lead including but not limited to any injury or damage related to, arising or alleged to have arisen out of any use, exposure, existence, detection, removal, elimination, avoidance, act, error, omission, failure to disclose or warn of the presence of lead or any other duty involving lead; or

   (4) Radon or any other radioactive emissions, manmade or natural, including but not limited to any injury or damage related to, arising or alleged to have arisen out of any use, exposure, existence, detection, removal, elimination, avoidance, act, error, omission, failure to disclose or warn of the presence of radon or any other radioactive emissions or any other duty involving radon or other radioactive emissions.

l. For:

   (1) Any injury or damage arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

   (2) Any loss, cost or expense arising out of any:

     (a) Request, demand, order or statutory or regulatory requirement that any "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

     (b) "Claim" or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effect of "pollutants".

m. For:

   (1) Refusal to employ;

   (2) Termination of employment;

   (3) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment,

discipline, defamation, harassment, humiliation or discrimination; or

   (4) The spouse, child, parent, brother or sister of that person as a consequence of any of the employment-related practices described in Paragraphs (1), (2), or (3) above.

This exclusion applies:

   (1) Whether the "insured" may be liable as an employer or in any other capacity; and

   (2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

n. Based in equity, including but not limited to injunctive relief.

o. For any construction or development activities or operations performed by or on behalf of the developer/sponsor of your association's property, including but not limited to, loss or damage arising out of construction, construction materials, landscape, design, surveys, or engineering services performed by or on behalf of such developer/sponsor.

**B. LIMITS OF INSURANCE**

1. **Directors and Officers Liability Aggregate Limit**

The Limit Of Insurance stated in the Declarations as aggregate is the most we will pay for all loss covered under DIRECTORS AND OFFICERS LIABILITY.

2. **Directors and Officers Liability Wrongful Act Limit**

Subject to 1. Above, the Limit Of Insurance stated in the Declarations as applicable to each "wrongful act" is the most we will pay for all loss incurred on account of any one "wrongful act" covered under DIRECTORS AND OFFICERS LIABILITY.

3. All "claims" or "suits" arising out of the same "wrongful act" shall be considered as arising out of one "wrongful act".

4. The inclusion of more than one "insured" shall not operate to increase the Limits Of Insurance. Our maximum liability will not exceed the limits stated in the Declarations.

5. The Limits of Insurance for DIRECTORS AND OFFICERS LIABILITY stated in the Declarations apply separately to each

consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

C. **AMENDED CONDITION**

Under Section IV. LIABILITY CONDITIONS, the following is added to Condition 2. Duties in the Event of Occurrence, Offense, Claim or Suit, paragraph a.:

You and any other "insured" must also see to it that we are notified as soon as practicable of a "wrongful act" that may result in a "claim".

D. **ADDITIONAL DEFINITIONS**

The following additional definitions are added to Section V. DEFINITIONS:

1. **"Claim"** means a demand for damages. However, claim shall not include court cost or attorney fees when other than monetary damages are sought.

2. **"Director"** means a director of the Named Insureds shown on the Declarations.

3. With respect only to the coverage provided by this endorsement and superseding any other meaning:

**"Insured"** means:

a. You;

b. Your "directors" or "officers", but only with respect to their duties for you;

c. Your current or former:

(1) Employees;

(2) Committee members;

(3) Board members;

(4) Volunteers;

but only while acting at your direction, or the direction of your "directors" or "officers", and within the scope of their duties for you.

d. Your property or real estate manager; but only while acting at your direction, or the direction of your "directors" or "officers", and within the scope of their duties for you.

HOWEVER, your property or real estate manager is not an "insured" for "claims" or "suits" brought against them by you.

e. Spouses of current or former "directors" or "officers" and legally recognized domestic partners of current or former "directors" or "officers", but only for "claims" arising out of "claims" against those "directors" or "officers" and only while acting at your direction, or the direction of your "directors" or "officers", and within the scope of their duties for you.

f. Any other natural person, and their estate, guardian or legal representative, who is no longer your "director" or "officer" at the time of discovery of a "wrongful act", but who was a "director" or "officer" at the time the "wrongful act" was committed.

4. **"Officer"** means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

5. With respect only to the coverage provided by this endorsement, the definition of "suit" is replaced by:

**"Suit"** means a civil proceeding in which damages because of any "wrongful act" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the "insured" must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the "insured" submits with our consent.

6. **"Wrongful act"** means any actual or alleged negligent:

a. Act;

b. Error;

c. Omission;

d. Mistake;

e. Misstatement;

f. Misleading statement or;

g. Breach of duty;

committed by or at the direction of a "director" or "officer" while acting within the scope or their duties, individually or collectively

| | |
|---|---|
| NORTH CAROLINA ) | IN THE GENERAL COURT OF JUSTICE |
| ) | DISTRICT COURT DIVISION |
| GUILFORD COUNTY ) | **18** CVD **5582** |
| ) | |
| Shasta D. Staley, ) | |
| Plaintiff ) | |
| v. ) | |
| ) | |
| Waterbury Association, Inc.; Wake Bridge ) | |
| at Waterbury Association, Inc.; Waterbury ) | |
| Board of Directors; Wake Bridge at ) | |
| Waterbury Board of Directors; Cheryl G. ) | |
| Conklin, individually and as a member of ) | |
| the Waterbury Association, Inc. and Wake ) | |
| Bridge at Waterbury Association, Inc.; ) | |
| Robert J. Conklin, individually and as a ) | |
| member of Wake Bridge at Waterbury ) | |
| Association, Inc.; Jerald F. Kraushaar, ) | |
| individually and as a member of ) | |
| Waterbury Association, Inc.; Anthony ) | |
| Williams, individually and as a member of ) | |
| the Waterbury Association, Inc. and Wake ) | |
| Bridge at Waterbury Association, Inc.; ) | |
| Natalie Mitchell, individually and as a ) | **AMENDED COMPLAINT FOR** |
| member of Waterbury Association, Inc.; ) | **INJUNCTIVE RELIEF AND DAMAGES** |
| Ann L. Cary-Whitaker, individually and ) | **AND** |
| as a member of Waterbury Association, ) | **SUPPLEMENTAL COMPLAINT** |
| Inc.; Gary S. McFarland, individually and ) | |
| as a member of Wake Bridge at ) | |
| Waterbury Association, Inc.; Charlie B. ) | |
| Fields, individually and as a member of ) | |
| Wake Bridge at Waterbury Association, ) | |
| Inc.; Jonathan Q. Morgan, individually ) | |
| and as a member of Wake Bridge at ) | |
| Waterbury Association, Inc.; Dennis M. ) | |
| Reynolds, individually and as a member ) | |
| of Wake Bridge at Waterbury Association, ) | |
| Inc.; Vikki G. Reynolds, individually and ) | |
| as a member of Wake Bridge at ) | |
| Waterbury Association, Inc.; Michael E. ) | |
| Casey, individually and as a member of ) | |
| Waterbury Association, Inc. ) | |
| Defendant(s) ) | |

**NOW COMES** PLAINTIFF complaining of Defendants, alleges and says:

Page 1 of 20

EXHIBIT

B

## JURISDICTIONAL ALLEGATIONS

1. Plaintiff, Shasta Staley, is a citizen and resident of Guilford County, North Carolina.

2. Defendant Waterbury Association, Inc. is a corporation organized and existing under the laws of the State of North Carolina doing business in Guilford County, North Carolina.

3. Defendant Wake Bridge at Waterbury Association, Inc. is a corporation organized and existing under the laws of the State of North Carolina doing business in Guilford County, North Carolina.

4. Defendant Cheryl G. Conklin is, upon information and belief, a citizen and resident of Guilford County, State of North Carolina and was, and is, at pertinent times, a member of the Board of Directors of Waterbury Association, Inc. and Wake Bridge at Waterbury Association, Inc.

5. Defendant Robert J. Conklin is, upon information and belief, a citizen and resident of Guilford County, State of North Carolina and was, and is, at pertinent times, appointed by of the Board of Directors of Wake Bridge at Waterbury Association, Inc. to act as a member of the Architectural Control Committee of Wake Bridge.

6. Defendant Jerald F. Kraushaar is, upon information and belief, a citizen and resident of Guilford County, State of North Carolina and was, and is, at pertinent times, a member of the Board of Directors of Waterbury Association, Inc.

7. Defendant Anthony Williams is, upon information and belief, a citizen and resident of Guilford County, State of North Carolina and was, and is, at pertinent times, a member of the Board of Directors of Waterbury Association, Inc. and Wake Bridge at Waterbury Association, Inc. and appointed by of the Board of Directors of Wake Bridge at Waterbury Association, Inc. to act as a member of the Architectural Control Committee of Wake Bridge.

8. Defendant Natalie Mitchell is, upon information and belief, a citizen and resident of Guilford County, State of North Carolina and was, and is, at pertinent times, a member of the Board of Directors of Waterbury Association, Inc.

9. Defendant Ann L. Cary is, upon information and belief, a citizen and resident of Guilford County, State of North Carolina and was, and is, at pertinent times, a member of the Board of Directors of Waterbury Association, Inc.

10. Defendant Gary S. McFarland is, upon information and belief, a citizen and resident of Guilford County, State of North Carolina and was, and is, at pertinent times, a member of the Board of Directors of Wake Bridge at Waterbury Association, Inc. and appointed by of the Board of Directors of Wake Bridge at Waterbury Association, Inc. to act as a member of the Architectural Control Committee of Wake Bridge.

11. Defendant Charlie B. Fields is, upon information and belief, a citizen and resident of Guilford County, State of North Carolina and was, and is, at pertinent times, a member of the Board of Directors of Wake Bridge at Waterbury Association, Inc. and appointed by of the Board of Directors of Wake Bridge at Waterbury Association, Inc. to act as a member of the Architectural Control Committee of Wake Bridge.

12. Defendant Jonathan Q. Morgan is, upon information and belief, a citizen and resident of Guilford County, State of North Carolina and was, and is, at pertinent times, a member of the Board of Directors of Wake Bridge at Waterbury Association, Inc.

13. Defendant Dennis M. Reynolds is, upon information and belief, a citizen and resident of Guilford County, State of North Carolina and was, at pertinent times, a member appointed by of the Board of Directors of Wake Bridge at Waterbury Association, Inc. to act as a member of the Architectural Control Committee of Wake Bridge.

14. Defendant Vikki G. Reynolds is, upon information and belief, a citizen and resident of Guilford County, State of North Carolina and was, at pertinent times, a member appointed by of the Board of Directors of Wake Bridge at Waterbury Association, Inc. to act as a member of the Architectural Control Committee of Wake Bridge.

15. Defendant Michael E. Casey is, upon information and belief, a citizen and resident of Guilford County, State of North Carolina and was, at pertinent times, a member of the Board of Directors of Waterbury Association, Inc.

16. The venue of Guilford County is appropriate because the real property that is the subject of this Complaint is located in Guilford County.

17. This is an action for:

    a. Injunctive Relief;
    b. Breach of Fiduciary Duty;
    c. Constructive Fraud;
    d. Unfair and Deceptive Practices;
    e. Breach of Contract; and
    f. Trespass.

## FACTUAL ALLEGATIONS

18. Upon information and belief, Defendants Cheryl G. Conklin and Robert J. Conklin are in a marital relationship with each other that has been in existence since at least 2000.

19. Upon information and belief, Defendants Dennis M. Reynolds and Vikki G. Reynolds are in a marital relationship with each other that has been in existence since at least 2000.

20. The Master Declaration of Covenants, Conditions, and Restrictions for the Waterbury Development was initially created and filed with the Guilford County Register of Deeds on 26 September 2000, in Book 5085 starting at page 1878 with amendments recorded as follows:
    a. Book 5361, Page 1602 on November 14, 2001;
    b. Book 5962, Page 2963 on October 20, 2003;
    c. Book 6656, Page 2577 on January 2, 2007;
    d. Book 7215, Page 200 on February 15, 2011; and
    e. Book 7833, Page 1023 on July 13, 2016.

21. The Declaration of Covenants, Conditions and Restrictions For the Wake Bridge at Waterbury was initially created and filed with the Guilford County Register of Deeds on 05 December 2000, in Book 5122 starting at page 36 with amendments recorded as follows:
    f. Book 5401, Page 1571 on December 27, 2001;
    g. Book 6259, Page 1361 on February 18, 2005;
    h. Book 6305, Page 925 on May 3, 2005;
    i. Book 6378, Page 102 on August 16;
    j. Book 6389, Page 1717 on September 2, 2005; and
    k. Book 7312, Page 176 on January 18, 2012.

22. Per Article V of the 2012 Amendment to Declaration of Covenants, Conditions, and Restrictions for Wake Bridge at Waterbury, an Architectural Control Committee (hereinafter "ACC") shall be appointed by the Wake Bridge at Waterbury Board of Directors to review new construction, additions, and remodeling that affect the exterior appearance of the property. The purpose of the ACC is to regulate the external design, appearance, use and location of initial construction, subsequent additions and improvements within the Wake Bridge subdivision of the Waterbury development in order to preserve and enhance values and to maintain a harmonious relationship among structures and the natural vegetation and topography.

23. Per Article V, Section 4 of the 2012 Amendment to Declaration of Covenants, Conditions, and Restrictions for Wake Bridge at Waterbury, any person desiring to make any improvement or change shall submit plans and specifications to the ACC for approval and in the event the ACC fails to approve, modify, or disapprove in writing an application within (45) days after accurate plans and specifications have been submitted to it, approval will not be required and the Declaration of Covenants, Conditions, and Restrictions for Wake Bridge at Waterbury will be deemed to have been fully complied with. The applicant may appeal an adverse ACC decision to the Wake Bridge Board of Directors, which may reverse or modify such decision by two-thirds (2/3) vote of the Directors.

24. The 2012 Amendment to Declaration of Covenants, Conditions, and Restrictions for Wake Bridge at Waterbury addresses "new construction" in the Wake Bridge subdivision of the Waterbury development separately in Article VI, Section 6.

25. Real property at 2006 Otter Creek Drive, Whitsett, North Carolina (hereinafter "2006 Otter Creek") is located in the Wake Bridge subdivision of the Waterbury development.

26. In February 2016, 2006 Otter Creek was conveyed to Plaintiff. As the owner of 2006 Otter Creek, Plaintiff is a mandatory member of Waterbury Association, Inc. and Wake Bridge at Waterbury Association, Inc.

27. Plaintiff purchased property at 2006 Otter Creek to construct a new place of residence for her and her family, which includes Plaintiff's 13 year-old daughter, Keana Cook (born 06/28/2005) and Plaintiff's 5year-old daughter, Julia Staley (born 03/01/2013.

28. The property at 2006 Otter Creek is under new construction; therefore, Plaintiff is mandated to allow the ACC to regulate the external design, appearance, use and location of the initial construction process.

29. On or around April 20, 2016, Defendant Robert Conklin, entered Plaintiff's property, unwanted, uninvited, and without authority. At that time, Defendant Robert Conklin made Plaintiff's General Contractor and surveyors leave by threatening to involve lawyers if they didn't stop everything they were doing.

30. Defendant Robert Conklin spoke with Plaintiff on April 21, 2016 via phone and informed Plaintiff of the approval process set out in the Declaration of Covenants, Conditions and Restrictions For the Wake Bridge at Waterbury. During the conversation, Plaintiff made a verbal request to put up a construction fence to keep trespassers out. Defendant Robert Conklin, immediately denied Plaintiff's request, but then stated that he would take this matter up before the other members of the ACC and inform Plaintiff of the decision at a later date.

31. In late April 2016, Plaintiff submitted a written ACC request for new construction and landscaping at 2006 Otter Creek, which stated that the existing trees would remain and included plans for a 9/12-roof pitch.

32. On May 4, 2016, Defendant Robert Conklin, provided a written denial from the ACC regarding Plaintiff's request to put up a construction fence by only providing an approval for a "No Trespassing/Private Property" sign. On the same day, Defendant Robert Conklin informed Plaintiff that the roof must have a 12/12-roof pitch, the freestanding garage must be built and finished at the same time the home is completed.

33. On May 9, 2016, Plaintiff's general contractor, and members of the ACC to include the following defendants: Robert J. Conklin, Anthony Williams, Dennis M. Reynolds, Vikki G. Reynolds and Gary S. McFarland met (at the request of the ACC) to discuss the application for new construction and landscaping for 2006 Otter Creek.

34. During the May 9th meeting, Plaintiff informed the committee that she would be making a request to cut down the trees along the front and side of the house at a later date. At that time, the ACC also informed Plaintiff that the plans to start construction at 2006 Otter Creek were not going to be approved unless the tree line remained with the structure of the home. Plaintiff expressly stated that she was not in agreement with keeping the tree line and also stressed the importance of maintaining a hidden mailbox, and requested that the 9/12-roof pitch be accepted. At some point, the ACC also requested Plaintiff to consider placing windows on the left side elevation.

35. On May 16, 2016, Plaintiff submitted new plans and a modified landscaping plan for 2006 Otter Creek. The landscaping plan included a hidden mailbox for oversized packages and an estate gate with piers and fencing material to deter trespassing.

36. Although Article VI, Section 23, states: (1) no fence shall be closer to the front side of a lot than the rear corner(s) of the main house, other properties located throughout the Wake Bridge at Waterbury community have fencing materials past the rear corner(s) of the main house.

37. Article VI, Section 12 states that the use of front yard accessory structures such as, but not limited to; lighting piers, gates, fences, and walls is not encouraged, but the Wake Bridge at Waterbury Association has several piers located through the community and a hidden mailbox at the club house. Property located within the Wake Bridge at Waterbury subdivision, on Osterville Court, has a fence with piers.

38. On May 17, 2016, Defendant Anthony Williams, once again asked Plaintiff to consider placing the additional windows on the Plaintiff's home and informed Plaintiff that the windows were not required. The Defendant also notified Plaintiff that (1) the roof pitch waiver was denied; (2) the entry gate presented in Plaintiff's request would be in violation of the Wake Bridge covenants; and (3) Plaintiff's request to have a statement placed in the Waterbury newsletter was honored.

39. On or around May 19, 2016, Cardinal Corporation, Inc. under the instruction of Mr. Casey trespassed on Plaintiff's property to manicure the lawn of common areas. Officers were called out on the scene and Defendant Mike Casey was contacted immediately by one of the workers from Cardinal Corporation.

40. On May 24, 2016, Plaintiff placed the Board members of Waterbury Association, Inc., the Board members of Wake Bridge at Waterbury Association, Inc., and appointees of the Architectural Control Committee of Wake Bridge on notice that damages would be sought for unauthorized trespassing.

41. On May 31, 2016, Defendant Anthony Williams informed Plaintiff that the ACC of Wake Bridge would not approve Plaintiff's request to build the detach garage without the tree line remaining. However, Plaintiff did not submit a wavier to build

the detach garage and nor was there any prior communication between Plaintiff and the ACC regarding there being such an issue to require a waiver for the detach garage.

42. On June 1, 2016, Plaintiff notified the ACC that their actions/decisions throughout the process have been malicious and that the agreement to the condition of the tree line remaining is being involuntarily agreed to until further remedies can be sought.

43. The tree line located between the street and the front elevation of 2006 Otter Creek is dangerous because: (1) it mainly consist of old, tall, flimsy pine trees that could potentially block the driveway or fall on someone 'or something, (2) Plaintiff's daughter has a serve allergy to pollen, which also triggers her asthma and rashes; (3) it causes the house to be placed in an unsafe location, as it can not be seen from the street. Thereby, making the home and individuals in the home a target. This could also lead to the prevention of others from rendering aid in an emergency situation.

44. On and around June 18, 2016, the following appointees of Wake Bridge ACC approved Plaintiff's request to start construction at 2006 Otter Creek: Robert J. Conklin, Anthony Williams, Dennis M. Reynolds, Vikki G. Reynolds and Gary S. McFarland. As seen by Plaintiffs Exhibit "A", the contract between Plaintiff and the ACC included the following restrictions: (1) Wake Bridge ACC were only allowed to conduct weekly inspections on Mondays between 11:00 – 11:30 am with or without the presence of Plaintiff or Plaintiff's General Contractor; (2) Permission of such inspections is limited only to the external portion of the home; (3) should the authorized parties of the ACC need to inspect the property on any other day, date, or time, the parties agree to arrange an appointment with Plaintiff or General Contractor; (4) conversation with construction workers personally unknown to the ACC member(s) shall not take place; thereby, all questions, comments, and concerns shall be addressed to Plaintiff's General Contractor or Plaintiff. The approved ACC request also contradicted Defendants prior statement regarding the condition needed to start building Plaintiff's house, as it stated, "A waiver is granted for the main house front entry garage based on retaining the existing tree line between the structure (house and garage) and 2006 Otter Creek.

45. As of the date of this amended complaint, a Certificate of Occupancy ("CO") has not been issued for 2006 Otter Creek, as the property is currently under construction.

46. Since the written agreement between Plaintiff and appointees of Wake Bridge ACC, Defendants have: (1) conducted inspections outside of authorized time without approval from the General Contractor or Plaintiff; (2) entered Plaintiff's internal section of the home without permission from the Plaintiff; and (3) held conversations with 2006 Otter Creek construction workers.

47. In 2017, Defendant Michael Casey contacted Plaintiff via phone to request permission for their lawn care contractors to entry. During the conversation, Defendant Casey informed Plaintiff that the ACC should have approved her waiver for the roof pitch request because the requirement of a 12/12 roof pitch was oppressive and that it has kept a lot of developers from buying and building on the lots in the Waterbury subdivision.

48. On August 17, 2017, appointees of the Wake Bridge ACC sent a notice to Plaintiff alleging that Plaintiff was in violation of Article VI, Section 15.1.

49. On September 21, 2018, Plaintiff submitted a landscaping plan with artificial plants and on September 27, the ACC stated that no artificial plants would be accepted in any exterior application.

50. Although Article VI, Section 23, states: (1) no fence shall be closer to the front side of a lot than the rear corner(s) of the main house and (2) chain link fencing is considered inappropriate, other properties located throughout the Wake Bridge at Waterbury community have fencing materials past the rear corner(s) of the main house. Property located at 2001 Otter Creek Drive, Whitsett, NC 27377 has material closer to the front side of their lot than the rear corner of that house this layered with artificial plants. In addition, the elected officials of Waterbury and Wake Bridge (to include Architectural Control Committee members) blocked an entrance to a path that is identified as a common area, which was know by Defendants to attract individuals to trespass across Plaintiff's property.

51. On August 18, 2018, Plaintiff notified the ACC that she would look into removable muntins for the remaining windows.

52. On April 2, 2018 the ACC requested to receive a definitive plan to address the window muntins; however, Plaintiff provided no reply. Therefore, on or around May 3, 2018, the Wake Bridge at Waterbury Association, Inc. demanded a meeting to be held on May 23, 2018 to address the alleged violation of Article VI, Section 15 of the 2012 Amended Declaration of Covenants, Conditions and Restrictions for Wake Bridge at Waterbury.

53. Upon information and belief, on May 14, 2018, Defendants, Robert Conklin and Anthony Williams, exceeded their authority of the written agreement between the ACC and Plaintiff by inspecting 2006 Otter Creek after 11:30 am.

54. On or around May 20, 2018, trespassers entered the property of 2006 Otter Creek and vandalized ten (10) windows. On or around May 26, 2018, three (3) additional windows were vandalized.

55. Plaintiff has made multiple complaints to law enforcement about trespassing at 2006 Otter Creek.

Case 1:21-cv-00530-WO-JEP   Document 4   Filed 06/29/21   Page 21 of 41

56. Since the start of the construction, Plaintiff has been able to obtain video footage and/or pictures of the trespassers and the dangers presented by keeping the existing tree line.

57. On May 23, 2018, prior to attending the scheduled Board meeting, Plaintiff submitted a waiver for Article IV, Section 15.1. During the Board meeting, the following Defendants verbally and unanimously denied Plaintiffs waiver request: (1) Cheryl G. Conklin; (2) Robert Conklin; (3) Anthony Williams; (4) Charlie Fields; (5) Jonathan Morgan; and (6) Gary McFarland.

58. During the May 23, 2018 Board meeting: (1) Defendants, Gary McFarland and Anthony Williams, admitted to entering the internal sections of Plaintiff's property at 2006 Otter Creek. However, Robert Conklin denied any allegations of such action and quickly reminded Board/ACC members that Plaintiff and the ACC contracted for inspections of only the external sections of 2006 Otter Creek; (2) Plaintiff explained that 2006 Otter Creek was still under construction; therefore, could not be under violation; (3) Defendant Anthony Williams stated that Plaintiff was in violation because of failing to communicate; and (4) Plaintiff presented her argument in why the Article VI, Section 15.1 should be waived (aesthetics, money restraints, home still under construction, and the ACC waived their right to govern 2006 Otter Creek under that section).

59. On or around May 31, 2018, the Board of Directors of Wake Bridge at Waterbury Association, Inc. alleged that Plaintiff was under violation of Article VI, Section 15.1 for forty (40) windows and would be fined ten dollars ($10.00) per day, per window if the alleged violation was not corrected within thirty (30) days from the date of the written notice.

60. On June 25, 2018, Defendants, Robert Conklin and Anthony Williams, made an inquiry to a subcontractor, unknown to Defendants, about the work he was conducting at 2006 Otter Creek.

61. On June 30, 2018, Plaintiff sent pictures of muntins in all windows of 2006 Otter Creek via e-mail to counsel, Atty. Margaret Chase with the ACC copied. Within the email, Plaintiff notified the Atty. and the ACC that no one from the Board, ACC, or person(s) person under their direction, is allowed on the property of 2006 Otter Creek any longer and that anyone who comes onto the property would be trespassing.

62. On July 9, 2018, the Defendants by way of counsel, Atty. Margaret Chase, replied that if Plaintiff refused to allow the ACC onto the property of 2006 Otter Creek the architectural request would be considered null and void and the Board would take appropriate measures. However, on July 16, 2018, Plaintiff notified Atty. Chase and the ACC/Board of Wake Bridge at Waterbury that she was no longer willing to allow anyone on the property due to Wake Bridge ACC members continuing to breach the terms of the June 2016 architectural request agreement.

63. On May 29, 2018, Plaintiff filled a "Complaint for Injunctive Relief and Damages" and Defendants through counsel, Atty. Margret Chase, filed a Motion to Dismiss for Failure to State a Claim.

64. Although the Motion to Dismiss for Failure to State a Claim documented Plaintiff was served on Plaintiff by first class mail on June 29, 2018, the accompanying cover letter was dated July 16, 2018 and Plaintiff did not receive the opposing counsels Motion to Dismiss for Failure to State a Claim until July 28, 2018.

65. Defendants, Waterbury Association, Inc., Cheryl G. Conklin, Robert J. Conklin, Jerald F. Kraushaar, Anthony Williams, Natalie Mitchell, Ann L. Cary, Gary S. McFarland, Charlie B. Fields, Jonathan Q. Morgan, Dennis M. Reynolds, Vikki G. Reynolds, and Michael E. Casey, served Plaintiff with Answer to Plaintiffs original complaint on or around August 6, 2018 by first class mail.

66. Defendant, Wake Bridge at Waterbury Association, Inc., filed and served Answer to Plaintiffs original complaint on August 10, 2018.

## FIRST CLAIM FOR RELIEF

### INJUNCTIVE RELIEF

67. The allegations of paragraph 1 through 66 are referred to and incorporated by reference.

68. The structure of the home, at 2006 Otter Creek, cannot be seen by the street due to a tree line that existed prior to Plaintiff purchasing 2006 Otter Creek.

69. The tree line mainly consists of tall flimsy pine trees that consist of a number of wild animals to include snakes, which proposes high risk to snake bites and the prevention of egress and ingress.

70. Plaintiff has two younger children that reside with her and the existing tree line places their safety and well being at risk.

71. In 2016, Plaintiff's youngest daughter was diagnosed as being allergic to pollen. The pollen triggers asthma attacks and causes rashes to form on the skin from head to toe.

72. The Waterbury Board of Directors acknowledged that trespassing onto Plaintiff's property at 2006 was an issue prior to Plaintiff purchasing the land by setting up a barrier at the driveway entrance that was constructed with a chain running across three (3) wooden posts with a no trespassing sign.

73. Plaintiff has made multiple complaints to law enforcement regarding individuals trespassing on her property at 2006 Otter Creek, two of these complaints resulted in reports of vandalism conducted by trespassers.

74. The ACC has wrongfully attached the existing tree line with the structure Plaintiff's newly constructed home at 2006 Otter Creek, which results in Plaintiff being prohibited to take appropriate security and safety measures for the well being and/or protection of Plaintiff, Plaintiff's family and visitors, and property located at 2006 Otter Creek. Therefore, the restriction to on the removal of the tree line affects Plaintiff's use and enjoyment of the land.

75. As a result of Defendants' acts, Plaintiff will sustain great and irreparable harm in that: (1) Plaintiff's daughter will experience life threatening respiratory episodes and allergic reactions and (2) the physical well-being for Plaintiff and other members of Plaintiff's household would be placed at high risk.

76. In light of the numerous and substantial grounds for relief stated above, Plaintiff has probable cause that she will prevail on a final determination in this matter and that she has reasonable apprehension of irreparable harm and loss absent injunctive relief.

77. Plaintiff cannot be fully compensated in damages and is without adequate remedy at law because the exact amount of damages Plaintiff will sustain will be difficult to determine for issues to include, but not limited to, unreasonable interference with Plaintiff's use and enjoyment of 2006 Otter Creek; mental anguish regarding physical safety; and Plaintiff's dependent's pain and suffering and medical expenses.

## SECOND CLAIM FOR RELIEF

### BREACH OF FIDUCIARY DUTY

78. The allegations of paragraph 1 through 77 are referred to and incorporated by reference.

### Conflict of interest

79. As members of the Waterbury Association, Inc. and Wake Bridge at Waterbury Association, Inc., there exists a fiduciary relationship between Plaintiff and the elected officials of Waterbury Association, Inc. and Wake Bridge at Waterbury Association, Inc. (to include Architectural Control Committee members), pursuant to N.C.G.S. §47F-3-103(a).

80. The individual Defendants, as elected officials of Waterbury Association, Inc., Wake Bridge Association, Inc., and appointees of the Architectural Control Committee of Wake Bridge, owed Plaintiff a duty of good faith and fair dealing in Association matters. Therefore, Defendants are required to discharge their duties to Plaintiff in

good faith, with diligence and care in which ordinarily prudent men exercise under similar circumstances in like positions, with respect to Plaintiff and Plaintiff's property.

81. Elected officials of Waterbury and Wake Bridge Association, Inc. (to include Architectural Control Committee members) violated their fiduciary duty by maintaining a conflict of interest across the bodies of the Waterbury Board of Directors, Wake Bridge Board of Directors, and ACC for Wake Bridge in the following manner:

   A. Defendant Cheryl Conklin was, and is, the President for the Waterbury Board of Directors and Treasurer for the Wake Bridge Board of Directors.

   As an individual with voting rights for both Boards, Defendant Cheryl Conklin's position of authority as President for the Waterbury Board of Directors conflicts with her interest as Treasurer for Wake Bridge Board of Directors. The decisions-making process made among the Waterbury and Wake Bridge Boards is tainted for Plaintiff were tainted by Cheryl Conklin conflict of interest, which resulted in unfair voting processes for Plaintiff.

   B. Defendant Robert Conklin was, and is, appointed by the Wake Bridge Board of Directors to regulate the external design, appearance, use and location of initial construction, subsequent additions and improvements within the Wake Bridge subdivision of the Waterbury community.

   The positions held by Defendants, Cheryl Conklin and Robert Conklin, is a conflict of interest because the two have a personal interest to maintain their martial relationship, which taints the decision-making process between the Wake Bridge Board of Directors and the ACC for Wake Bridge for Plaintiff. Defendant's marital relationship with Defendant Cheryl Conklin resulted in unfair voting processes for Plaintiff.

   C. Defendant Anthony Williams was, and is, the Vice President for the Waterbury Board of Directors, President for the Wake Bridge Board of Directors, and appointed by the Wake Bridge Board of Directors to regulate the external design, appearance, use and location of initial construction, subsequent additions and improvements within the Wake Bridge subdivision of the Waterbury community.

   As an individual with voting rights for both Boards and the ACC, Defendant Anthony Williams is a person who has a position of authority in one organization that conflict with his interest in another. Therefore, the decisions made among the Waterbury and Wake Bridge Boards and the ACC for Wake Bridge for Plaintiff were, and are, tainted by Anthony Williams conflict of interest and resulted in unfair voting processes for Plaintiff.

Page 12 of 20

D. Defendant Gary McFarland was, and is, the Vice President for the Wake Bridge Board of Directors and appointed by the Wake Bridge Board of Directors to regulate the external design, appearance, use and location of initial construction, subsequent additions and improvements within the Wake Bridge subdivision of the Waterbury community.

As an individual with voting rights for both, the Wake Bridge Board of Directors and the ACC for Wake Bridge, Defendant Gary McFarland's position of authority in both bodies conflicted with his interest as an appointee for Wake Bridge ACC. Therefore, the decisions made among the Wake Bridge Boards and ACC for Wake Bridge for Plaintiff were tainted by Gary McFarland conflict of interest and resulted in unfair voting processes for Plaintiff.

E. Defendant Charlie B. Fields was, and is, the Secretary for the Wake Bridge Board of Directors and appointed by the Wake Bridge Board of Directors to regulate the external design, appearance, use and location of initial construction, subsequent additions and improvements within the Wake Bridge subdivision of the Waterbury community.

As an individual with voting rights for both, the Wake Bridge Board of Directors and the ACC for Wake Bridge, Defendant Charlie B. Fields's position of authority on the Wake Bridge Board of Director as Secretary conflicted with his interest as an appointee for Wake Bridge ACC. Therefore, the decisions made among the Wake Bridge Boards and ACC for Wake Bridge for Plaintiff were tainted by Charlie B. Fields conflict of interest and resulted in unfair voting processes for Plaintiff.

F. Defendant Vikki G. Reynolds was appointed by the Wake Bridge Board of Directors to regulate the external design, appearance, use and location of initial construction, subsequent additions and improvements within the Wake Bridge subdivision of the Waterbury community.

G. Defendant Dennis M. Reynolds was appointed by the Wake Bridge Board of Directors to regulate the external design, appearance, use and location of initial construction, subsequent additions and improvements within the Wake Bridge subdivision of the Waterbury community.

The positions held by Defendants, Vikki G. Reynolds and Dennis M. Reynolds were a conflict of interest because the two had, and have, a personal interest to maintain their martial relationship, which taints the decision-making process within the ACC for Wake Bridge, which resulted in an unfair voting process for Plaintiff.

**Bad acts and abuse of discretion**

82. Defendants, Robert Conklin; Anthony Williams; Dennis Reynolds; Vikki Reynolds; and Gary McFarland, while acting in their appointed capacity as a ACC member, breached their fiduciary duty during Plaintiff's initial request to start construction at 2006 Otter Creek in 2016. Defendants clearly abused their discretion, acted in bad faith, unfairly, and in a dishonesty manner by requiring Plaintiff to agreed that the existing tree line between the street and the front elevation of Plaintiff's home remained attached to the structure of the home before agreeing that Plaintiff could start construction at 2006 Otter Creek, which ultimately results in the Plaintiff's house never being seen by the street.

83. Defendants breached their fiduciary duty of care by making a biased decision to permanently attach the tree line to Plaintiff's house and disregarding reasonable concerns regarding safety.

84. Although Defendants has a right to approve or disapprove landscaping, Defendants' decision to attach the tree line to Plaintiff's home is inconsistent with the normal practice their duties, as no other homeowner in the Wake Bridge subdivision or Waterbury Community has such condition placed on his or her property.

85. Defendants further acted in bad faith by trying to disguise their malicious intent by implying that the tree line acted as a wavier; however, the reasoning provided by Defendants for attaching the tree line to Plaintiff's house was inconsistent with Plaintiff's actual request and e-mails, thereby showing malice.

86. Defendants know and should have known that the tree line disallows Plaintiffs home to be seen from the street and it's mere existence creates potential hazards. Therefore, Defendants breached their duty of care by denying Plaintiff's reasonable request not to permanently attach the tree line to Plaintiff's home at 2006 Otter Creek.

**Improper citing of violation**

87. As set out in Article V, Section 4 of the 2012 Amendment to Declaration of Covenants, Conditions, and Restrictions for Wake Bridge at Waterbury, Defendants, Robert Conklin; Anthony Williams; Charlie Fields; and Gary McFarland, acting as appointees of the ACC for Wake Bridge had, and have, a fiduciary duty to provide a written approval, modification, or disapproval of an application (Wake Bridge Architectural Request Form) within forty-five (45) days of receiving the architectural request or the request is approved.

88. Defendants, Cheryl G. Conklin; Robert Conklin; Anthony Williams; Charlie Fields; Jonathan Morgan; and Gary McFarland breached their fiduciary duty by failing to not follow procedures as set out in the covenants for Wake Bridge at Waterbury. Defendants failed to give proper consideration to whether Plaintiff's May 23, 2018

Wake Bridge Architectural Request Form was properly handled prior to citing the alleged violation. As a result, Defendants cited Plaintiff with an alleged violation prior to providing Plaintiff with a written denial for her May 23, 2018 Wake Bridge Architectural Request, as required by the covenants for Wake Bridge at Waterbury.

89. Defendants wrongfully and maliciously alleged Plaintiff violated Article VI, Section 15.1 of the 2012 Amendment to Declaration of Covenants, Conditions, and Restrictions for Wake Bridge at Waterbury and provided Plaintiff with a notice to correct the alleged violation within 30 days or be fined ten dollars ($10.00) per day, per window for forty (40) windows without the ACC of Wake Bridge providing Plaintiff with a written notice of denial or modification of Plaintiff's May 23, 2018 architectural request, as set out in Article V, Section 4.

90. Plaintiff complied with the May 31, 2018 notice as demanded by Defendants to avoid hefty fines and incurred damages in the amount of two thousand, sixty-four dollars and ninety cents ($2,064.90).

91. Plaintiff's architectural request is approved due the ACC of Wake Bridge failing to provide a written denial or modification of Plaintiff's May 23, 2018 architectural request within forty-five (45) days of the request being made.

**Plaintiff's injuries**

92. As a result of the conflict of interest mentioned above, a breach of fiduciary duty was created because the duty owed to Plaintiff of good faith and fair dealing in Association matters was not provided. The decision-making processes that were, and are, being carried out on matters involving Plaintiff are of bad faith and is the proximate cause of Plaintiff's injuries.

93. The breach of fiduciary duties was the proximate cause of 1) Plaintiff not being afforded a fair and meaningful opportunity to be heard by the Wake Bridge Board of Directors; 2) unreasonable interference with Plaintiff's safety, use, and enjoyment of and on 2006 Otter Creek; and 3) Plaintiff incurring damages for the placement of the muntins to avoid being fined for the alleged violation of Article VI, Section 15.1.

## THIRD CLAIM FOR RELIEF

### CONSTRUCTIVE FRAUD

94. The allegations of paragraph 1 through 93 are referred to and incorporated by reference.

**Malicious and Inappropriate Citing of Violation**

95. Upon information and belief, Defendant Cheryl G. Conklin, Anthony Williams, Charlie Fields, Jonathan Morgan and Gary McFarland have sought to benefit wrongly

from their breach of fiduciary duty by attempting to extract monies from Plaintiff by imposing hefty unwarranted fines and through indirect discrimination housing practices.

96. The Board and ACC of Wake Bridge at Waterbury falsely misrepresented a material fact that Plaintiff was in violation of the Wake Bridge covenants for not having muntins in 40 windows at 2006 Otter Creek.

97. Defendants violated their duty to Plaintiff by making the deceptive material misrepresentation to Plaintiff that she would be fined for allegedly being in violation of the Wake Bridge at Waterbury covenants.

98. The Board and ACC of Wake Bridge at Waterbury falsely misrepresented that Plaintiff would have to pay ten dollars ($10.00) for each window per day that Plaintiff allegedly violated Article VI, Section 15.1. However, N.C.G.S. §47F-3-107.1, states that, "If it is decided that a fine should be imposed, a fine not to exceed on hundred dollars ($100.00) may be imposed for the violation".

99. Defendants violated their duty to Plaintiff by making the deceptive material misrepresentation to Plaintiff that she would be fined for each window; however, Article VI, Section 15.1 covered all windows and no additional violation was cited. Thereby, Defendants made a material misrepresentation regarding the amount Plaintiff would be fined per day, as there is only one alleged violation.

100. Plaintiff reasonably relied on the Board and ACC's threat to fine Plaintiff for the alleged violation and to be fined per window.

101. Defendants' actions were intended to make Plaintiff install the muntins as she did.

102. Plaintiff incurred damages in the estimated amount of $2,064.90 for having muntins installed to avoid being fine.

**Violation of Fair Housing Act**

103. Title VIII of the Civil Rights Act of 1968 (Fair Housing Act), as amended, prohibits discrimination in the sale, rental, and financing of dwellings, and in other housing-related transactions, because of race, color, religion, sex, familial status, national origin, and disability.

104. Upon information and belief, Wake Bridge at Waterbury covenants requirement of a 12/12-roof pitch strategically manages to only allow custom built homes to be built in the Wake Bridge at Waterbury subdivision to prevent low-income housing units, production builders, and semicustom builders from building in the Wake Bridge at Waterbury community, which contributes to indirect discrimination in housing.

105. The Board and ACC of Wake Bridge at Waterbury misrepresented a material fact that Plaintiff would be in violation of the Wake Bridge covenants for constructing a roof with a measurement other than a 12/12-roof pitch, as set out in the covenants of Wake Bridge at Waterbury.

106. Plaintiff relied on the Board and ACC's denial of Plaintiff's waiver for a 9/12-roof pitch and threat of being in violation of the Wake Bridge covenants. However, the requirement of a 12/12-roof pitch is alleged to be void due to such requirement resulting in indirect discrimination of housing.

107. Defendants' actions were intended to make Plaintiff construct a 12/12 –roof pitch.

108. Plaintiff incurred damages estimated to be in excess of $3,000 for constructing a 12/12-roof pitch as Defendants' actions were intended to make Plaintiff do.

109. Defendants knew or should have known of the falsity of the misrepresentation regarding the alleged violation and 12/12 –roof pitch.

**FOURTH CLAIM FOR RELIF**

**UNFAIR AND DECEPTIVE TRADE PRACTICES**

110. The allegations of paragraph 1 through 109 are referred to and incorporated by reference.

111. Defendant Michael Casey acted as President of the Board of Directors for Waterbury, prior to being voted out and replaced by Defendant Cheryl Conklin. Therefore, Defendant Michael Casey held a position of authority that required him to know and understand the affects of the Declaration of Covenants, Conditions and Restrictions for the Wake Bridge at Waterbury on commerce. Defendant Michael Casey's position as President also allowed him to be privy to information that would not otherwise be available to other members of the Waterbury or Wake Bridge Association.

112. Defendant Michael Casey admitted to Plaintiff that the requirement for a 12/12 – roof pitch is oppressive.

113. Upon information and belief, the Board of Directors for Waterbury and Heron Pointe, another subdivision within the Waterbury community, tried to prevent the construction of affordable homes in the community that were to constructed by Keystone Homes.

114. Per N.C.G.S. §75-1.1, unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful and any party claiming to be exempt from the provisions of this section shall have the burden of proof with respect to such claim.

115. Defendants have violated N.C.G.S. §75-1.1, the North Carolina Unfair and Deceptive Trade Practices Act. Defendants' usage of the requirement for a 12/12 – roof pitch is immoral, unethical, oppressive, and unscrupulous.

116. The requirement of a 12/12 – roof pitch manages to only allow custom built homes to be built in the Wake Bridge at Waterbury subdivision to prevent low-income housing units, production builders, and semicustom builders from building in the Wake Bridge at Waterbury community, which contributes to indirect discrimination in housing.

117. Defendants', Cheryl G. Conklin, Robert J. Conklin, Anthony Williams, Dennis M. Reynolds, Vikki G. Reynolds and Gary S. McFarland, decision to uphold the requirement of a 12/12 – roof pitch as set out in the 2012 Declaration of Covenants, Conditions and Restrictions for the Wake Bridge at Waterbury brings about unfair and deceptive practice and such actions were in or affecting commerce relating to the unsold lots in the Waterbury subdivision.

118. As a proximate cause of Defendants' unfair and deceptive trade practices, Plaintiffs was injured and is entitled to damages estimated to be in excess of $3,000 for being required to construct a 12/12 – roof pitch, although Plaintiff requested a waiver for a 9/12 – roof pitch.

## FIFTH CLAIM FOR RELIEF

### BREACH OF CONTRACT

119. The allegations of paragraph 1 through 118 are referred to and incorporated by reference.

120. A Wake Bridge Architectural Request Form was a legally enforceable written agreement that existed between the ACC and Plaintiff with the intent to contract on definite enforceable terms. Plaintiff offered to allow the ACC onto her property at 2006 Otter Creek at certain times in exchange for consideration of Plaintiff's request.

121. The terms set out in paragraph 43 were mutually agreed upon and provided as consideration in order to allow Plaintiff to build her home at 2006 Otter Creek and to allow the appointees of the Wake Bridge ACC to conduct external inspections on Plaintiffs property without conversation to contractors.

122. The agreement between the ACC and Plaintiff was breached by Defendants' actions set out in paragraph 46, 53, 58, and 60.

123. Plaintiff incurred nominal damage to land due to trespassing completed by and/or under the instruction of the elected officials of Waterbury and Wake Bridge Association, Inc. (to include Architectural Control Committee members).

### SIXTH CLAIM FOR RELIEF

### TRESPASS

124. The allegations of paragraph 1 through 123 are referred to and incorporated by reference.

125. Defendants, Anthony Williams and Gary McFarland entered Plaintiff's property, at 2006 Otter Creek, without permission to do so.

126. Upon information and belief, Defendants, Robert Conklin, entered Plaintiff's property, at 2006 Otter Creek, without permission to do so.

127. Cardinal Corporation entered Plaintiff's property, at 2006 Otter Creek, without permission to do so by Plaintiff. Defendant, Michael Casey provided permission for Cardinal Corporation to enter Plaintiff's property at 2006 Otter Creek in May 2016 without the authority to do so.

128. Plaintiff incurred nominal damage to land due to trespassing completed by and/or under the instruction of the elected officials of Waterbury and Wake Bridge Association, Inc. (to include Architectural Control Committee members).

**WHEREFORE,** having complained of Defendants, Plaintiff asks the Court for the following relief:

1. A permanent injunction enjoining Defendants from engaging in or performing any of the following acts:

    i.    Requiring Plaintiff to seek approval for the following items:

        a)  Removal of trees from the front and left elevation of the home and maintain two shade trees as set out in the 2012 covenants for Wake Bridge at Waterbury;

        b)  Removal of trees on the left hand side of the driveway.

        c)  Allow placement of artificial plants; and

        d)  Placement of an estate gate in the front elevation of the property to assist with trespassers, to include material such as bricks, open style

metal fence, with a hidden mailbox and lights once professional drawings are provided to the ACC.

    ii.   Operating under the conflicts of interest described in paragraphs 79 – 81 above.

2. Order any and all prior violations null and void.

3. Find that Defendants waived their right to enforce Article VI, Section 15.1 of the 2012 Declaration of Covenants, Conditions and Restrictions of the Wake Bridge at Waterbury based on the ACC failing to provide a written decision of denial or modification within forty-five (45) days of receiving Plaintiff's May23, 2018 Wake Bridge Architectural Request Form.

4. Order denials of Plaintiff's Architectural Request void.

5. Order that Defendants shall be independently as well as jointly and severally liable for attorney fees and court cost.

6. Plaintiff has and recovers compensatory damages in excess of $3,000.00 from Defendants.

7. Award punitive damages by finding that Defendants acted in bad faith and unfair dealings.

8. Award Plaintiff treble damages pursuant to the Unfair and Deceptive Trade Practices Act.

9. That cost of this action be taxed to Defendants.

10. That the Plaintiff have and recover all such other relief as the Court may deem just, fair, and proper.

This 16th day of August, 2018.

Respectfully submitted,

Shasta D. Staley, *pro se*
1319 Brookview Drive
Gibsonville, NC 27249
336-681-0257

Case 1:21-cv-00530-WO-JEP   Document 4   Filed 06/29/21   Page 33 of 41



| | |
|---|---|
| Date prepared | February 12, 2019 |
| Notice of loss date | August 28, 2018 |
| Claim number | 782122-GH |
| Policy number | ACP BPHF2284424360 |
| Questions? | Contact Claims Associate |
| | Cheryl Bateman |
| | BATEMAC@nationwide.com |
| | Phone 407-312-8994 |
| | Fax 866-767-2079 |

WAKE BRIDGE AT WATERBURY ASSOCIATION, INC
PO BOX 18186
GREENSBORO, NC 27419-8186

## Claim details

| | |
|---|---|
| Insurer: | Nationwide Mutual Fire Insurance Company |
| Policyholder: | WAKE BRIDGE AT WATERBURY ASSOCIATION, INC |
| Claimant: | Shasta Staley |
| Claim number: | 782122-GH |
| Loss date: | May 31, 2018 |



Dear Policyholder,

Nationwide Mutual Fire Insurance Company (hereinafter referred to as "Nationwide") acknowledges receipt on August 28, 2018 of the above-referenced claim. After receiving the claim, we were provided with a lawsuit styled:

SHASTA D. STALEY v. WATERBURY ASSOCIATION, INC.; WAKE BRIDGE AT WATERBURY ASSOCIATION, INC.; WATERBURY MASTER BOARD OF DIRECTORS: WAKE BRIDGE AT WATERBURY BOARD OF DIRECTORS; CHERYL G. CONLKIN, individually and as a member of the Waterbury Association, Inc and Wake Bridge at Waterbury Association, Inc.; ROBERT J. CONKLIN, individually and as a member of the Wake Bridge at Waterbury Association, Inc.; JERALD F. KRAUSHAAR individually and as a member of the Waterbury Association Inc.; ANTHONY WILLIAMS, individually and as a member of the Waterbury Association, Inc and Wake Bridge at Waterbury Association, Inc; NATALIE MITCHELL, individually and as a member of Waterbury association Inc; ANN L CARY-WHITAKER, individually and as a member of Waterbury Association Inc; GARY S MCFARLAND, individually and as a member of Wake Bridge at Waterbury Association, Inc.; CHARLIE B FIELDS, individually and as a member of Wake Bridge at Waterbury Association, Inc; JONATHAN Q MORGAN, individually and as a member of Wake Bridge at Waterbury Association Inc; DENNIS M REYNOLDS, individually and as a member of Wake Bridge at Waterbury Association, Inc; VIKKI REYNOLDS, individually and as a member of Wake Bridge at Waterbury Association, Inc; MICHAEL E CASEY, individually and as a member of Waterbury Association, Inc

Our review of the complaint styled above reflects that the plaintiff is alleging that the defendants have committed trespass, breach of contract, harassment, application of fines and/or penalties against plaintiff. It is our understanding that the plaintiff purchased a parcel of land within the Wake Bridge at Waterbury Association, Inc. (Hereinafter referred to as "Wake") intending to build a residence. Throughout the construction of the home, the ARC and its members have allegedly directed plaintiff to make modifications to her original plans to accommodate ARC requirements. The plaintiff alleges, within the complaint, that the accommodations that she was directed to make have affected her ability to complete the construction of the home and obtain a Certificate of Occupancy. As of the date of this letter, the remaining counts against Wake are for breach of contract and injunctive relief.



EXHIBIT
C

Individual board members - Anthony Williams, Bob Cooklin and Gary McFarland - have a trespass count remaining against them. With respect to the trespass allegation, plaintiff alleges that these board members entered the property without permission and spoke with contractors/workers which breached their agreement with plaintiff.

Nationwide issued a Premier Businessowner's Policy to Wake under policy ACP BPHF2284424360 with effective dates from March 19, 2018 through March 19, 2019. The policy carries liability limits of $1,000,000 per occurrence and carries Directors and Officers Liability Coverage with a $1,000,000 per occurrence and $1,000,000 aggregate limit.

We have reviewed the applicable policy and coverage forms available to Wake under the Premier Businessowner's Liability Coverage and the Directors and Officers endorsement. To specifically analyze the coverage in this policy as related to the claim, we refer you to the Premier Businessowner's Liability Coverage Form PB 0006 11 14,

This coverage form reads, in part:

SECTION I – COVERAGES

COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement

a. We will pay those sums up to the applicable Limit of Insurance that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages for which there is coverage under this policy.

HOWEVER, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

We may, at our sole discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

But:
(1) The amount we will pay for damages is limited as described in Section III. LIMITS OF INSURANCE; and
(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under COVERAGES A or B or medical expenses under COVERAGE C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

b. This insurance applies to "bodily injury" and "property damage" only if:
(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and
(2) The "bodily injury" or "property damage" occurs during the policy period; and
(3) Prior to the policy period, no insured listed under Paragraph 1. of Section II. WHO IS AN INSURED and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage"

during or after the policy period will be deemed to have been known prior to the policy period.

c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II. WHO IS AN INSURED or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II. WHO IS AN INSURED or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:
(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;
(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or
(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

. . .

COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY

1. Insuring Agreement
a. We will pay those sums up to the applicable Limit of Insurance that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages for which there is coverage under this policy.

However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply.

We may, at our sole discretion, investigate any offense and settle any claim or "suit" that may result. But:
(1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and
(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

. . .

While the Insuring Agreement explains when coverage may be applicable, an Endorsement is an amendment or addition to an existing insurance contract which changes the terms or scope of the original policy. An endorsement may be used to add, delete, exclude or otherwise alter coverage. Under the Businessowner's Liability Coverage Form PB 0006 11 14 captioned above, the incident described fails to met the definition of an "occurrence" and the damages sought fail to meet the definition of "bodily injury", "property damage" and "personal and advertising injury" for which this coverage form provides. Therefore, no coverage exists under the Premier Businessowner's coverage

form for this claim.

We now refer you to Endorsement PB4100 0515 on your policy entitled "DIRECTORS AND OFFICERS LIABILITY (COOPERATIVES OR CONDOMINIUMS)." This endorsement provides claims-made coverage. The Directors and Officers Liability coverage carries liability limits of $1,000,000 per occurrence with a $1,000,000 aggregate limit per policy term.

This endorsement modifies insurance provided under the Premier Businessowner Liability Form.

The following is added to Section I: COVERAGES:
DIRECTORS AND OFFICERS LIABILITY
(COOPERATIVES OR CONDOMINIUMS)

1. INSURING AGREEMENT
We will pay those sums up to the applicable Limit of Insurance that the "Insured", as defined in this endorsement, becomes legally obligated to pay as damages for any "claims" made arising out of a "wrongful act" committed during the Coverage Period shown in the Schedule of this endorsement and to which this insurance applies. A "claim" seeking damages will be deemed to have been made when notice of such "claim" is received and recorded by an "insured" or by us, whichever comes first during the Coverage Period shown in the Schedule of this endorsement. Any "claims" received and recorded by the :insured" within sixty (60) days after the end of the policy period will be considered to have been received within the policy period. We will have the right and duty to defend any "insured" against a "suit" seeking those damages for a "claim" for which there is coverage under DIRECTORS AND OFFICERS LIABILITY.

HOWEVER,
a.  No coverage applies for any "wrongful acts" which occur prior to the Retroactive Date shown in the Declarations, and

b.  We will have no duty to defend the "insured" against any "suit" seeking damages for "wrongful acts" to which this insurance does not apply.

c.  We may, at our sole discretion, investigate any "wrongful acts" and settle any "claim" or "suit" that may result.  But:

(1) The amount we will pay for damages is limited as described in B. LIMITS OF INSURANCE that follows; and
(2) Our right and duty to defend will end when we have used up the applicable limit of insurance in the payment of judgments or settlements under this coverage.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – Coverages A and B.

. . .

Again, as with the underlying coverage form this endorsement has exclusions that can alter coverage. Please turn your attention to the exclusions section of the endorsement that reads, in part,

4. EXCLUSIONS

The following exclusions apply to DIRECTORS AND OFFICERS LIABILITY. This insurance, including

any duty we have to defend "suits", does not apply to "claims":

e. For anything other than money damages.

n. Based in equity, including but not limited to injunctive relief.

. . .

The allegations being presented against Wake include claims for injunctive relief and breach of contract. As the claim for injunctive relief is a request for action instead of monetary relief, this count is specifically excluded under this coverage form. The breach of contract allegation against Wake and trespass allegations against individual board members are also excluded from coverage as these allegations do not meet the definition of a "wrongful act" which is an actual or alleged negligent act.

Lastly, we refer you to the pertinent terms contained within the policy and endorsements quoted above are defined as follows:

SECTION V – DEFINITIONS

The terms "you", "your", "we", "us", "our" and "insured" are defined in the Preamble of this Coverage Form. The following words or phrases, which appear in quotation marks throughout this Coverage Form and any of its endorsements, are defined as follows:

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:
a. False arrest, detention or imprisonment;
b. Malicious prosecution;
c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;
d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
e. Oral or written publication, in any manner, of material that violates a person's right of privacy;
f. The use of another's advertising idea in your "advertisement"; or
g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

17. "Property damage" means:
a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to
occur at the time of the "occurrence" that caused it.
For the purposes of this insurance, electronic data is not tangible property.
As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:
a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or
b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

Additional Relevant Definitions from Endorsement PB 4100 Directors And Officers Liability

Section V. Definitions

1. "Claim" means a demand for damages. However, claim shall not include court cost or attorney fees when other than monetary damages are sought.
2. "Director" means a director of the Named Insureds shown on the Declarations.
3. With respect only to the coverage provided by this endorsement and superseding any other meaning:

"Insured" means:

a. You;
b. Your "directors" or "officers", but only with respect to their duties for you;
c. Your current or former;
(1) Employees;
(2) Committee members;
(3) Board members;
(4) Volunteers;
But only while acting at your direction, or the direction of you "directors" or "officers", and within the scope of their duties for you.
d. Your property or real estate manager; but only while acting at your direction, or the direction of your "directors" or "officers", and within the scope of their duties for you.
HOWEVER, your property or real estate manager is not an "insured" for "claims" or "suits" brought against them by you.

e. Spouses of current or former "directors" or "officers" and legally recognized domestic partners of current or former "directors" or "officers", but only for "claims" arising out of "claims" against those "directors" or "officers" and only while acting at your direction, or the direction of your "directors" or "officers", and within the scope of their duties for you.
f. Any other natural person, and their estate, guardian or legal representative who is no longer your "director" or "officer" at the time of discovery of a "wrongful act", but who was a "director" or "officer" at the time the "wrongful act" was committed.

4. "Officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

5. With respect only to the coverage provided by this endorsement, the definition of "suit" is replaced by:
"Suit" means a civil proceeding in which damages because of any "wrongful act" to which this insurance applies are alleged. "Suit" includes:
a. An arbitration proceeding in which such damages are claimed and to which the "insured" must submit or does submit with our consent; or
b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the "insured" submits with our consent.

6. "Wrongful act" means any actual or alleged negligent
a. Act;
b. Error;
c. Omission;
d. Mistake;
e. Misstatement;
f. Misleading statement or;
g. Breach of duty;
 committed by or at the direction of a "director" or "officer" while acting within the scope or their duties individually or collectively

. . .

## CONCLUSION

Pursuant to the "Insuring Agreement" sections of Coverage A and Coverage B of your Premier Businessowner's Liability Policy, we will pay damages resulting in "bodily injury", "property damage", and "personal and advertising injury" to which this insurance applies, resulting from an "occurrence" or offense. And, we have no duty to defend a claim or suit to which this insurance does not apply.

The Plaintiff fails to allege and "occurrence" for which this insurance will apply and the damages sought fail to meet the definition of a "bodily injury", "property damage" and "personal and advertising injury" and therefore no coverage will be afforded under the Premier Businessowner's coverage form



Now, turning to the Directors and Officers Liability (Cooperatives or Condominiums) Endorsement, coverage is provided for sums an insured becomes legally obligated to pay as damages for any claims made arising out of a "wrongful act" committed during the coverage period to which this insurance applies. The Endorsement defines a "claim" as a demand for damages. However, claim does not include court costs or attorney fees when other than monetary damages are sought. "Wrongful acts" are defined in the endorsement as actual or alleged "negligent" acts. The alleged actions of Wake and/or the individuals board members described within the complaint are not negligent in nature. Therefore, we find that these do not constitute "wrongful acts" under the Directors and Officers Liability Coverage. Additionally, the individual board members may not constitute "insureds" under the Directors and Officers coverage to the extent their alleged trespass occurred outside the scope of their duties for Wake. For these reasons, we find that the Directors and Officers Liability form does not provide coverage for this claim.

In conclusion, Nationwide has reviewed the suit papers provided to us in conjunction with the insurance coverage issued to Wake and declines to provide a defense or indemnity for this matter for both Wake and the individuals named in the suit.

We reserve the right to review any additional information or amendments to this claim to make a separate determination as to coverage. Our decision regarding coverage presented in this letter is based as presented to us to date and should not be construed as a waiver of any future coverage position.

If you are served with an amended lawsuit, please notify us immediately so we may review same for coverage. Should you have any questions or wish to bring to our attention additional facts that might alter this investigation, please do not hesitate to contact us.

Should you have questions concerning the foregoing, please do not hesitate to contact me at the number below.

## For more information

If you have any questions or concerns, please contact me at 407-312-8994 or
BATEMAC@nationwide.com.

Sincerely,

Cheryl Bateman
Nationwide Mutual Fire Insurance Company
P.O. Box 182068
Columbus, OH 43218-2068